RANGER INSURANCE CO., Appellant,

v.

MUSTANG AVIATION, INC., Appellee.

No. 21127.

Court of Appeals of Texas,
Dallas.

Aug. 2, 1982.
Rehearing Denied Sept. 8, 1982.

Frank Finn, John H. Martin, Thompson & Knight, Dallas, for appellant.

Mike Davis, Byrd, Davis & Eisenberg, Austin, for appellee.

Before ROBERTSON, CARVER and WHITHAM, JJ.

CARVER, Justice.

Ranger Insurance Co. sued its liability policy holder Mustang Aviation, Inc., as well as various heirs of Kenneth Cortese, who had recovered judgment against Mustang for damages for Cortese's death in an aircraft accident, seeking a declaratory judgment that Ranger's policy did not apply because the aircraft involved in the accident was neither scheduled on the policy nor was it "temporarily used as the substitute for such (scheduled) aircraft." The trial court denied relief to Ranger and we affirm because we conclude that the aircraft in the accident was a temporary substitute for a Mustang aircraft scheduled on Ranger's policy.

The record consists of undisputed facts and documentary exhibits. Ranger issued its liability policy to Mustang effective January 1, 1973, for one year, covering a number of Mustang's aircraft, including a Cessna 401 model. On September 18, 1973, Mustang agreed to charter the Cessna 401 to carry a music group, including Cortese, to performances in Oklahoma, Mississippi, Louisiana, departing from and returning to Dallas. Later, on the same day of the charter agreement, Mustang's manager learned that their Cessna 401 was disabled and he arranged for the charter to be flown with an aircraft, Beech E–18, and pilot, Robert Elliott, of Roberts Airways. Mustang and Roberts Airways agreed to divide the charter fee. On September 20, 1973, the Beech E–18 crashed after take-off from

the Natchitoches, Louisiana, airport causing Cortese's death. Cortese's heirs recovered their judgment against Mustang in a federal court proceeding which did not adjudicate the issue raised here. The liability policy of Ranger primarily undertakes:

"To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death, at any time resulting therefrom, sustained by any person . . . [including passengers] . . . caused by an occurrence and arising out of the ownership, maintenance or use of the aircraft." (scheduled aircraft including the Cessna 401).

In addition, Ranger's policy undertakes: "4. The Insurer further agrees that, while an aircraft owned by the Named Insured and declared in this Policy, is withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction, such insurance as is afforded by this Policy with respect to such aircraft applies also with respect to another aircraft of similar type horse-power, and seating capacity, whether or not owned by the Insured, while temporarily used as the substitute for such aircraft."

The parties stipulated that the Beech E–18 "was an aircraft of similar type to Mustang's Cessna 401." Ranger's policy also contained this exclusion:

"5. The EXCLUSIONS of the Policy to which this Endorsement is attached are deleted and are replaced by the following exclusions:

'EXCLUSIONS. Unless otherwise provided in the Policy of insurance, the liability insurance afforded under this Policy shall not apply to:

\* \* \* \* \* \*

(c) Liability assumed by the Named Insured under any contract or agreement, unless such liability would have attached to the Insured even in the absence of such contract or agreement: . . . .' "

Upon request, the trial court prepared and filed its findings, including:

3. As a result of a judgment entered by the United States District Court for the Northern District of Texas, Dallas Division in Civil Action No. CA–3–74–843–G, Linda Cortese, administrator of the estate of Kenneth Dominick Cortese, deceased; and individually and as mother and natural guardian of Eric Cortese, as heir of Kenneth Dominick Cortese v. Bromley Corporation, d/b/a, Robert's Airways, and Mustang Aviation, Inc., Mustang Aviation, Inc. is liable to the plaintiffs in this suit for damages in the amount of $280,000.00 plus interest and costs, sustained as a result of the wrongful death of Kenneth Dominick Cortese in the crash of a twin-engine Beech aircraft, model E–18, registration number N50JR, on September 20, 1973.

4. On September 18, 1973, Mustang Aviation, Inc. contracted to provide charter service to the Jim Croce group for the flight in question.

5. Mustang Aviation, Inc. owned a Cessna 401 aircraft, registration number N21MH, which was regularly used by Mustang in its charter operation.

6. This Cessna 401 aircraft was listed and declared in the aviation liability policy AC A9–175879.

7. Although Mustang intended that the charter in question be flown in this Cessna 401 aircraft, the aircraft was withdrawn from normal use because of a mechanical breakdown which required that it be grounded for repairs.

8. The twin-engine model E–18 Beech aircraft, registration number N50JR, involved in the crash in question was temporarily used as the substitute for Mustang Aviation's Cessna 401 aircraft, registration number N21MH.

9. This temporary substitute aircraft, owned by Bromley Corporation, was similar to the withdrawn Cessna 401 aircraft, belonging to Mustang Aviation, Inc. as required by paragraph 4 of the controlling policy provision, the CAB Standard Endorsement in aviation liability policy AC A9–175879.

10. Ranger Insurance Company neither raised the issue nor proved that the E–18 temporary substitute aircraft was not a similar aircraft as described in paragraph 4 of the CAB Standard Endorsement in aviation liability policy, policy number AC A9–175879.

11. Mustang Aviation did not contractually assure any liability for risks which did not arise as a matter of law in the conduct of its business.

■ Ranger first complains that the record fails to show that its policy was invoked at all because the damages adjudged to Cortese's heirs was not "caused by an occurrence and arising out of the ownership, maintenance or use of the aircraft." Ranger argues that, by the plain words of the policy, absent Mustang's *ownership* (the Beech E–18 was owned by Roberts Airway); absent Mustang's *maintenance* (no maintenance was involved); and absent Mustang's *use* (the pilot Roberts was an employee of Roberts Airways, not Mustang's); its insurance agreement with Mustang was never invoked. Mustang responds that, while neither aircraft nor pilot belonged to Mustang, Mustang used (in the policy sense of "use") them both to perform its charter when its own aircraft was temporarily disabled. Counsel does not cite, nor have we found any Texas authority applicable in these circumstances. We are persuaded to reject Ranger's argument and adopt Mustangs position in reliance upon *Lumbermens Mutual Casualty Co. v. Harleysville Mutual Casualty Co.*, 367 F.2d 250 (4th Cir.1966); *Lloyds America v. Ferguson*, 116 F.2d 920 (5th Cir.1941); and *Roberts v. Gonzalez*, 495 F.Supp. 1310 (D.C.V.I.1980).

In *Lumbermens'*, William Dalton owned a 1954 Ford insured for liability by State Farm Mutual Insurance Company. William's son, Ray Dalton, lived with his father and owned a 1955 Ford uninsured. William and his son, Ray, worked at the same mill and William daily hauled himself and his son, as well as other workmen who paid for this passage, back and forth to the mill. On September 1, 1959, William's car would not start and he asked Ray to drive Ray's car and carry the paying passengers to the mill. On the way, Ray struck Gertrude Soughern, who, later, recovered a judgment against William as principal and Ray as William's agent for $25,000. *Lumbermens'* holds that William was *using* Ray and Ray's car to perform William's obligation to haul his paying passengers at a time that William's car was temporarily disabled; consequently, State Farm's liability policy covered Ray's car as a "temporary substitute automobile." Likewise, we hold that Mustang used Elliott and the Beech E–18 to haul Mustang's charter while Mustang's Cessna 401 was temporarily disabled.

In *Lloyds,* Dunlap operated a passenger busline with a number of buses scheduled on a liability policy which also covered substitute buses for disabled ones. On March 29, 1938, the Plymouth bus expected to carry ticketed passengers was undergoing repairs and a seven passenger Packard, owned by Dunlap personally and not scheduled on the liability policy, was substituted for the Plymouth. However, there were more than seven ticketed passengers and the excess were hauled in a taxicab. The taxi was involved in an accident and passenger, Ferguson, was injured. Ferguson recovered judgment against Dunlap for $5000 and sued Lloyds who issued the liability policy to Dunlap. *Lloyds* holds that, even though the Packard was a "substitute vehicle" for the Plymouth, so also was the taxi a "substitute vehicle" since both were necessary to perform Dunlap's carriage for hire agreement will all ticketed passengers, consequently, Ferguson could recover on the liability policy of Lloyds. Likewise, we hold that, since Elliott and the Beech E–18 were used as a substitute for Mustang's pilot and its Cessna 401 to perform Mustang's charter to haul the charter passenger, Cortese, Ranger's liability policy protects Cortese's heirs.

In *Roberts,* a Caribbean Airline Inc., ticketed Roberts roundtrip between San Juan and St. Thomas. The aircraft of Caribbean scheduled for the flight lost a tail wheel during the preceding flight but landed safely and was taken out of service for repair.

Caribbean arranged for Conquest Airways to carry Roberts and other ticketed Caribbean passengers, with Conquest's own ticketed passengers, on the same flight schedule. Caribbean retained ¼ of the fare it had collected and paid ¾ of the fare to Conquest. The Conquest flight crashed and killed Roberts and others on take-off. Caribbean was insured by Lloyds and Roberts heirs sought recovery on the theory that the Conquest aircraft was a "temporary substitute" for Caribbean's disabled plane. *Roberts* holds that Caribbean "used" the Conquest pilot and aircraft for the same use Caribbean's disabled aircraft (and pilot) would have put to had Caribbean's aircraft not been disabled. Likewise, we hold Mustang used Elliott and the Beech E–18 for the same use the Mustang Cessna 401 would have been put to had the Cessna 401 not been disabled.

▪ Ranger next complains that the record fails to show that the Beech E–18 aircraft was of a "similar type, horsepower, and seating capacity" so as to qualify under the policy as a substitute aircraft. Ranger concedes that the parties stipulated that "The Bromley (corporation doing business as Roberts Airways) aircraft involved in the crash in question was an aircraft of similar type to Mustang's Cessna 401, N21MH," but urges the stipulation is short of the equally required "similar horsepower" and "similar seating capacity." Mustang responds that Ranger did not dispute in its pleadings that the two aircraft were similar in each and every respect and did not raise the argument now offered counsel or the trial court at anytime. Moreover, since Ranger has filed and prosecuted this suit for a declaration of non-coverage, the burden to prove any dissimilarity between the aircraft was on Ranger, not Mustang. We agree with Mustang that the burden was on Ranger to plead and prove any fact precluding coverage, including dissimilarity when it sought a declaration of non-coverage. *Evans v. General Ins. Co.,* 390 S.W.2d 818 (Tex.Civ. App.—Dallas 1965, no writ); *Republic Casualty Co. v. Obregon,* 290 S.W.2d 267 (Tex. Civ.App.—Waco 1956, writ ref'd n.r.e.). We hold that since Ranger offered no evidence

negating similarity and, additionally, stipulated generally that the two aircraft were of similar type, dissimilarity of horsepower and seating capacity, if any, could not defeat coverage.

▪ Ranger additionally complains that, since Mustang's liability arose from its contract of charter, it was entitled to a declaration of non-liability because its policy specifically excluded:

"EXCLUSIONS

. . . . .

c. Liability assumed by the Named Insured under any contract or agreement, unless such liability would have attached to the Insured even in the absence of such contract or agreement . . ."

We cannot agree. Ranger's argument mistakenly conceives the charter contract as the source of Mustang's liability, however, the source of Mustang's liability was found by the federal court to be "the pilot's failure to exercise the highest degree of care [which] was a proximate cause of the airplane crash," and "Mustang is estopped from denying that Roberts Airways was its agent and is liable for the [negligent] acts of that agent." *Croce v. Bromley Corp.,* 623 F.2d 1084, 1088, 1090 (5th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). We conclude and hold that Mustang's liability was not one "assumed" by contract or agreement, but imposed for its own tort. Consequently, the quoted exclusion does not support a declaration of non-liability.

▪ Lastly, Ranger complains that the trial court erroneously concluded that the issue of whether exclusion "c" (quoted in the foregoing paragraph) was applicable, was resolved against Ranger in a prior suit between Mustang and Ranger. Ranger argues that the prior suit did not include the Cortese heirs therefore no identify of parties had been shown so as to make the judgment in the prior suit "res judicata" in the present suit. Further, Ranger argues that the prior suit did not address the applicability of exclusion "c" as such suit was

limited to whether Ranger had a duty to defend, as distinguished from a duty to pay. We need not address these arguments since, under the stipulations and documentary evidence, and without reliance upon the trial court's finding, we have already concluded in foregoing paragraph that exclusion "c" did not apply or support a declaration of non-liability. Since the trial court reached the correct conclusion, any error in the trial court's findings leading to the correct conclusion is immaterial. *Talcott v. Valley Federal Sav. & Loan,* 611 S.W.2d 692, 693, 694 (Tex.Civ.App.—Corpus Christi 1980, no writ).

Affirmed.

WHITHAM, Justice, dissenting.

I respectfully dissent. In my view the trial court erred in finding that there was coverage under the liability policy. Accordingly, I would reverse and render.

Mustang Aviation and Roberts Airways entered into an arrangement whereby Roberts undertook to provide the transportation as carrier. Mustang paid Roberts $552.35 of the $952.63 collected by Mustang for the charter. Roberts flew the passengers—not Mustang. No aircraft of Mustang flew the charter. No pilot employed by Mustang flew the charter. The aircraft was owned by Roberts. The pilot was employed by Roberts. Once it agreed to fly the charter, Roberts controlled the entire operation of the aircraft in following the flight itinerary. The aircraft used was never in the possession or under the control of Mustang. Mustang never temporarily "used" a substitute aircraft. Mustang was never in the air. The present case involves the substitution of one charter air carrier for another charter air carrier rather than the substitution of an aircraft.

The present case appears to be one of first impression in this state. The majority relies on *Lloyds America v. Ferguson,* 116 F.2d 920 (5th Cir.1941); *Lumbermens Mutual Casualty Co. v. Harleysville Mutual Casualty Co.,* 367 F.2d 250 (4th Cir.1966); and *Roberts v. Gonzalez,* 495 F.Supp. 1310 (D.V.I.1980). I would decline to follow in

this state the interpretation of the substitution provision made in those cases. I would apply the correct interpretation in *Tanner v. Pennsylvania Threshermen & Farmers Mutual Casualty Insurance Co.,* 226 F.2d 498 (6th Cir.1955) that the substitution provision only applies if the vehicle (aircraft) is "in the possession or under the control of the insured to the same extent and effect as the disabled car (aircraft) of the insured would have been except for its disablement." Since the aircraft used was never in the possession or under the control of Mustang, then under *Tanner's* test the Roberts' aircraft is not covered under the policy.

I recognize that words of exclusion or limitation should be strictly construed against the insurer and that the court must adopt the construction urged by the insured as long as that construction is not itself unreasonable. *Glover v. National Insurance Underwriters,* 545 S.W.2d 755, 761 (Tex.1977). In the present case, however, the construction urged by the insured, and adopted by the majority, is unreasonable. In the present case Roberts, not Mustang, performed the entire air transportation service required. Mustang did not fly the passengers, arrange for airport landings and departures, see to baggage and equipment of the passengers or service and fuel the aircraft while in use. In short, Mustang performed none of the myriad of functions required to be performed in carrying out the charter flight. I simply cannot agree that substitution of an entire transportation service is the substitution of the "use" of an aircraft within the meaning of this policy. To be covered under this policy the Roberts' aircraft must have been in the possession or under the control of Mustang to the same extent and effect as the disabled aircraft of Mustang would have been except for its disablement. The Roberts' aircraft was not, therefore, the Roberts' aircraft was not covered under the policy.

Moreover, I do not agree with the implication, if not holding, in the majority opinion that Mustang's liability for "using" the Roberts' aircraft, through Roberts as agent,

has already been judicially determined. *See Croce v. Bromley Corp.*, 623 F.2d 1084, 1088 (5th Cir.1980). I interpret that case to hold that Mustang is estopped from denying that Roberts was its agent because Mustang did not advise the Croce group that a Roberts pilot and Roberts aircraft were going to make the flight. As the federal district court put it: "Mustang was under a duty to speak. Mustang did not." For this reason only did the Fifth Circuit determine that Mustang was liable for the deaths caused through the operation of the Roberts aircraft. Thus, Mustang's liability was based solely on a holding "that Mustang is estopped from denying that Roberts Airways was its agent and is liable for the acts of that agent." *Croce v. Bromley Corp.*, 623 F.2d at 1088. Liability based on an agency one is estopped to deny for failure to speak does not establish that Mustang was "using" the Roberts aircraft.

Ranger contracted to insure Mustang. The majority requires Ranger to insure Roberts. I disagree with the majority's too liberal interpretation of the substitution provisions which adds Roberts as a named insured under the policy. The judgment of the trial court should be reversed and judgment rendered that the aircraft which actually made the flight was not insured under the liability policy.