321 So.2d 401 (1975)
Denver J. BABINEAUX, Plaintiff-Appellant,
v.
Walter LAVERGNE et al., Defendants-Appellees.
No. 5135.
Court of Appeal of Louisiana, Third Circuit.
October 31, 1975.
*402 Landry, Poteet & Landry by John G. Poteet, Jr., Lafayette, for plaintiff-appellant.
Shelton & Cline by Larry T. Richard, Rayne, for Wingate.
Voorhies & Labbe by Edwin G. Preis, Jr., Lafayette, for Aetna.
Davidson, Meaux, Onebane & Donohoe, by Dennis L. Doise, Lafayette, for Dixie Auto.
Walter J. Lavergne, Jr., in pro. per.
Before HOOD, CULPEPPER and MILLER, JJ.
HOOD, Judge.
Denver J. Babineaux instituted this suit to recover damages for injuries sustained by him when his automobile collided with a vehicle owned and being driven by Walter Lavergne. The defendants are Lavergne, Harold J. Wingate, Aetna Life and Casualty Insurance Company and Dixie Auto Insurance Company. The trial court rendered judgment in favor of plaintiff and against Lavergne, and he rejected plaintiff's demands against all other defendants. Plaintiff appealed.
The issues presented are (1) whether Lavergne, an employee of Wingate, was acting in the course of his employment at the time of the accident, and (2) whether the Lavergne automobile was a "Temporary Substitute Automobile" for a disabled truck owned by Wingate, within the meaning of automobile liability policies issued to Wingate by Aetna and Dixie.
The accident occurred at 4:05 P.M. on Saturday, November 17, 1973, in the City of Rayne. While Lavergne was driving his 1969 Plymouth automobile west on Jefferson Davis Avenue, he attempted to make a left turn at the intersection of that avenue with Malvern Street, and as he did so his car collided with an automobile being driven east on Jefferson Davis Avenue by plaintiff Babineaux. Plaintiff sustained personal injuries as a result of that collision. The sole proximate cause of the accident was Lavergne's negligence in attempting to make a left turn in front of the oncoming Babineaux vehicle.
At the time the accident occurred, Wingate was engaged in the house moving business, and Lavergne was in his regular employment. Lavergne had worked for Wingate as a foreman for several years. He worked regularly five days per week, and he was off work on Saturdays and Sundays.
The collision occurred on a Saturday afternoon. Wingate was not engaged in any house moving activities and Lavergne was not working that day. Before the accident occurred, Wingate delivered a check to an employee in Branch, Louisiana, and he planned to deliver a pay check to another employee, Adless Domingue, in Rayne that afternoon. He was using his 1972 Chevrolet pickup truck to make those deliveries, but the truck developed some motor trouble before the second check was delivered, and Wingate stopped at a gas station in Rayne to get it fixed. While he was in that station waiting for the repairs on his truck to be completed, Lavergne happened to drive into the same station in his own 1969 Plymouth automobile to get some gasoline. The meeting of Wingate and Lavergne at the service station was purely accidental.
*403 Since the repairs to Wingate's truck would take some time, Wingate asked Lavergne if he would deliver Adless Domingue's pay check to him, and Lavergne agreed to do so. Wingate testified that Lavergne was not working that day, that he asked Lavergne to deliver the check strictly as a favor, that he did not order him to make the delivery, that he did not compensate him for it, and that he did not consider the delivery of that check to be a part of Lavergne's job.
Lavergne confirmed the testimony of Wingate. He testified that he was not working on the day of the accident, that he and Wingate were friends of long standing and that he consented to deliver the check to Domingue strictly as a favor to his friend. He stated that he was not ordered to deliver the check, that he was not compelled in any way to do so, that he received no compensation for it, that Wingate gave him no instructions as to how and when the delivery was to be made, and that he did not consider the delivery of the check to be a part of his job.
Lavergne also testified that he planned to visit his sick uncle before he delivered the check to Domingue. After receiving the check, he put it in his shirt pocket and then drove west on Jefferson Davis Avenue to the intersection of that thoroughfare with Malvern Street where the accident occurred. His uncle lived on Malvern Street, a short distance south of that intersection. Lavergne testified that he was turning left at that crossing in order to go to his uncle's home. Just prior to reaching that intersection he picked up his cousin, St. Amant, since his cousin also planned to visit the uncle.
The evidence shows that Domingue lived in the extreme south part of Rayne. The intersection where this accident occurred is in the northwest part of the city. The route along which Lavergne was traveling at the time of the collision led directly toward the home of his ill uncle, but it did not lead to Domingue's home. In order for Lavergne to go to Domingue's home from the scene of the accident it would have been necessary for him to turn around, or turn back, and travel east to get back to a street which he had already crossed and which would enable him to reach Domingue's home.
Plaintiff contends that Wingate gave Lavergne two checks to be delivered that afternoon, one of which was made payable to Domingue and the other to a second alleged employee, George Guidry, who they contend lived on Jefferson Davis Avenue about one-half block west of the point where the accident occurred. They argue that Lavergne was delivering the Guidry check at the time of the accident, and that he thus was performing a duty for Wingate. The evidence shows that Guidry was not working for Wingate at that time, that he had not worked for him for more than a month, that he in fact was living in Texas, and that Wingate did not ask Lavergne to deliver a check to Guidry. It also shows that Lavergne could not have been en route to Guidry's former home in Rayne, since he was negotiating a left turn at Malvern Street before he reached the place where plaintiff contends Guidry resided.
The trial judge found that Lavergne was not working for Wingate on the day the accident occurred, that the meeting of those two parties at the service station was unplanned, that Lavergne was under no obligation to deliver the check to Domingue, that he was not compensated for running that errand, that delivering checks was not one of Lavergne's regular duties, and that he undertook the errand as a personal favor to his friend Wingate, and not because of the employment relationship. He concluded that Lavergne was not acting within the course of his employment at the time of the accident, and that Wingate was not liable for the damages caused by Lavergne's negligence.
The liability of a master for the acts of his servant is provided in LSA-C.C. arts.
*404 176, 2317 and 2320. Article 2320 provides in part that:
"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."
Whether an employee was acting within the course and scope of his employment must be decided on the facts of each case. Sweet v. Trahan, 159 So.2d 782 (La.App. 3 Cir. 1964). The test to be applied is whether the employee is performing some function for his employer and for which he was employed. Laird v. Travelers Indemnity Company, 236 So.2d 561 (La.App. 4 Cir. 1970); Jefferson v. Rose Oil Company of Dixie, 232 So.2d 895 (La. App. 2 Cir. 1970).
We find no error in the holding of the trial court that Lavergne was not acting within the course of his employment at the time the accident occurred, and that Wingate thus is not liable for the damages which plaintiff sustained as a result of Lavergne's negligence.
Plaintiff contends, however, that although Wingate is not liable for the negligent acts of Lavergne, defendants Aetna and Dixie are liable to plaintiff on the ground that the 1969 Plymouth automobile being used by Lavergne at the time of the accident was a "temporary substitute automobile" for Wingate's disabled truck, and that the Lavergne automobile thus was covered under the liability provisions of the policies issued by those insurers to Wingate.
At the time the accident occurred, there was in effect a family automobile insurance policy which had been issued by Aetna to Wingate. The policy specifically described and covered Wingate's 1972 Chevrolet pickup truck, that vehicle being listed as an "owned automobile." The policy also provided that the term "owned automobile" includes a "temporary substitute automobile," which is described as follows:
"`temporary substitute automobile' means any automobile or trailer, not owned by the named Insured, while temporarily used with the permission of the owner as a substitute for the owned automobile or trailer when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;"
The trial court, relying on Tanner v. Pennsylvania Threshermen and Farmers' Mutual Casualty Insurance Company, 226 F.2d 498 (6 Cir. 1955), concluded that the Plymouth automobile being used by Lavergne was not a "temporary substitute automobile" for Wingate's truck, within the meaning of the provisions of the Aetna policy, and that the policy thus did not provide coverage of the damages sustained by plaintiff in the above accident.
The issues presented in Tanner were similar to those which are presented here. The court held there that in order for a non-owned vehicle to be covered as a "substitute car," the non-owned automobile must be in the possession or under the control of the insured to the same extent and effect as the disabled car of the insured would have been except for its disablement. It found that the alleged substitute automobile was being driven by its owner, not by the named insured, at the time of the accident, that it was not in possession or under the control of the insured, and that it thus was not a temporary substitute automobile within the meaning of the policy.
We agree with the trial court in the instant suit that the Plymouth automobile being used by Lavergne at the time the accident occurred was not a "temporary substitute automobile," as that term is used in the Aetna policy. Although we find Tanner, supra, to be persuasive, we base our conclusion on the fact that Lavergne agreed to deliver the check strictly as a personal favor for, and not as agent or employee of, Wingate. Lavergne's Plymouth automobile was not being used by *405 Wingate, or his agent, and it was not being used by an "insured" named in the Aetna policy. We hold that under the circumstances presented here, it was not a temporary substitute for the owned automobile described in the policy, that is, Wingate's 1972 Chevrolet pickup truck.
We thus affirm the conclusion reached by the trial judge that Aetna is not liable to plaintiff under the policy which Aetna had issued to Wingate.
There also was in effect at the time of the accident an automobile liability policy which had been issued to Wingate by defendant Dixie. That policy covered several vehicles owned by the named insured, Wingate, but it did not cover the 1972 Chevrolet pickup truck which was being repaired at that time. The Dixie policy provided substantially the same coverage for a "temporary substitute automobile," as did the Aetna contract. Since the Dixie policy did not list the disabled pickup truck as a "Described Automobile" in that policy, there clearly is no merit to plaintiff's argument that Lavergne's automobile was a temporary substitute for any of the vehicles described in that policy, or that coverage was provided by Dixie in this instance.
As we understand plaintiff's arguments, he did not contend that coverage was provided by any other provision of the Dixie policy.
Our ultimate conclusion is that Wingate is not liable for the damages sustained by plaintiff, and that plaintiff has no recovery against Aetna or Dixie under the automobile liability policies issued by those insurers. We thus find no error in the judgment rendered by the trial court.
For the reasons assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.