**Gena Crumedy DEADWILER and Anthony Jenkins, Appellants–Plaintiffs,**

**v.**

**CHICAGO MOTOR CLUB INSURANCE COMPANY, Appellee–Defendant.**

**No. 56A03–9205–CV–127.**

Court of Appeals of Indiana, Third District.

Nov. 30, 1992.

Transfer Denied Feb. 9, 1993.

Robert D. Brown, Spangler, Jennings & Dougherty, P.C., Merrillville, for appellants-plaintiffs.

Joseph S. Reid, Hand, Muenich, Wilk & Reid, Highland, for appellee-defendant.

GARRARD, Judge.

*I. Facts and Procedural History.*

Gena Deadwiler and Anthony Jenkins appeal a grant of summary judgment by the

Newton Circuit Court in favor of Chicago Motor Club Insurance Company with regard to her claim that Chicago breached its contractual obligation in failing to provide her with insurance coverage. We affirm.

Dorothy Crumedy has two daughters, Gena and Brenda. Gena is 27 and lives in Gary, Indiana with Dorothy. Brenda lives in Miller, Indiana. Dorothy was the owner of a 1978 Chevrolet Impala. The Impala was insured with the Chicago Motor Club. Her daughter Gena was the owner of a 1983 Oldsmobile Cutlass Cierra. The Cierra had been insured with Chicago as well, but Gena allowed the coverage to lapse, and as a result her Cierra was not insured.

In August of 1988 Dorothy developed transmission trouble with her Impala, and was unable to drive the car. Dorothy had not heard from Brenda for a week, because Brenda's phone was disconnected, and was concerned about Brenda's well being. At the end of that week, on Friday, August 19, 1988, Dorothy asked Gena to drive out to Miller to check on Brenda. At approximately 8:00 p.m. on the 19th, Gena left for Brenda's house with her fiance Anthony Jenkins in Gena's Cierra. Gena and Anthony stayed at Brenda's home until approximately 1:00 a.m. Saturday morning. Anthony drove home. On their way home Gena and Anthony stopped at a gas station and a liquor store. While Anthony was still driving, he and Gena were involved in an auto accident with David Kelsey. David has no automobile insurance.

Gena and Anthony brought this action against Chicago seeking uninsured motorists coverage and medical payments coverage under Dorothy's policy. They claim that Gena's Cierra was a "temporary replacement automobile" under that policy.

Gena filed her complaint against Chicago and David on October 28, 1988. She sought damages for injuries she received in the accident with David, and sought uninsured motorists coverage and medical payments coverage from Chicago.

David filed his answer on November 16, 1988. Gena filed a motion for default judgment against Chicago, which resulted in a default judgment. Chicago filed a motion for relief from that judgment, and it was set aside on agreement of the parties.

Gena filed a motion for declaratory judgment against Chicago, which Chicago moved to have struck. The trial court denied the motion for declaratory judgment.

At this time, Anthony filed a claim against Chicago with substantially similar legal and factual issues. Upon motion of Chicago, Anthony's and Gena's cases were consolidated.

Gena and Anthony, and Chicago filed cross motions for summary judgment. Hearing was held on these motions on August 29, 1991. The trial court entered judgment on January 6, 1992 denying Gena's and Anthony's motion for summary judgment, and granting Chicago's motion for summary judgment. Gena and Anthony appeal this judgment.

## II. Issue Presented.

Gena and Anthony present one issue for review:

Whether the automobile operated by Gena was a "temporary substitute" automobile entitled to insurance coverage under Dorothy's policy.

## III. Analysis and Conclusion.

 Under Trial Rule 56(H) we will not reverse a summary judgment on the ground that there is a genuine issue of fact unless the material fact and the evidence relevant thereto were specifically designated to the trial court. Where there is no factual dispute, our task is to determine whether the trial court correctly applied the law, *Second Nat. Bank v. Massey–Ferguson Credit* (1985), Ind.App., 478 N.E.2d 916.

In the case at bar, the legal issue surrounds the proper interpretation and application of a "temporary substitute" clause in an automobile insurance policy.[1] Gena

---

1. Dorothy's insurance policy with Chicago stated in pertinent part:

"Definitions

\*　　\*　　\*　　\*　　\*　　\*

argues that her car was a temporary substitute entitled to coverage under Dorothy's policy. Chicago counters that Gena is not entitled to coverage under the temporary substitute clause in Dorothy's policy. The question of the interpretation and application of a "temporary substitute" clause is one of first impression in the State of Indiana.

■ The well recognized intent of a "temporary substitute" clause is not to narrow the coverage of an insurance policy, but to provide the insured with continuous coverage for one operating vehicle on one policy. *Standard Mut. Ins. Co. v. Sentry Ins. of Illinois, Inc.* (1986), 146 Ill.App.3d 905, 100 Ill.Dec. 498, 497 N.E.2d 476, *cert. denied; Atkinson v. State Farm Mut. Auto. Ins. Co.* (1984) 18 Ohio App.3d 59, 18 OBR 173, 480 N.E.2d 819; *Teter v. Corley* (1978), 2 Kan.App.2d 540, 584 P.2d 651; *Vanminos v. Merkley* (1975), 48 A.D.2d 281, 369 N.Y.S.2d 246.

The parties cite cases which at first blush appear to be inconsistent. Chicago relies on *Tanner v. Pennsylvania Threshermen & F.M.C. Ins. Co.* (6th Cir.1955) 226 F.2d 498 and its progeny. Mike and Louis Zarzour owned separate cafes in the city of Chattanooga, Tennessee. Mike and Louis were brothers. Mike's car, which was covered by insurance, was in the shop for repairs. Louis helped Mike get his car to the shop and took Mike back to his cafe. Upon arriving at Mike's, Mike realized that he did not have any beef at his cafe. He asked Louis to go to his cafe and bring back some beef. Louis agreed. Louis first went home to pick up his wife and children, and then headed for his cafe to pick up the beef. On his way there he was involved in an auto accident. Louis attempted to gain coverage under Mike's insurance policy as a temporary substitute. The district court disagreed finding that Louis's errand was "in the nature of a friendly or brotherly accommodation." *Id.* at 500. The Sixth Circuit Court of Appeals affirmed, agreeing entirely with the district court's construction:

"the word "substitute car" [means] a car which was *in the possession or under the control of the insured to the same extent and effect as the disabled car of the insured would have been except for its disablement.* He pointed out that the Mercury belonging to Louis was not, at the time of the accident in the possession or under the control of the insured; but that it was in the sole possession and

"Your covered auto" means: ...
4. Any auto or trailer you do not own while used as a temporary substitute for any other vehicle described in this definition which is out of normal use because of its:
a. breakdown;
b. repair;
 \* \* \* \* \* \*
Medical Payments Coverage
Insuring Agreement
We will pay reasonable expenses incurred for necessary medical and funeral services because of bodily injury:
1. caused by accident; and
2. Sustained by a covered person.
 \* \* \* \* \* \*
"Covered person" as used in this Part means:
1. You or any family member:
a. while occupying; or
b. as a pedestrian when struck by:
a motor vehicle designed for use mainly on public roads or a trailer of any type.
2. Any other person while occupying your covered auto or a non-owned auto operated by you or any family member.
 \* \* \* \* \* \*
Uninsured/Underinsured Motorists Coverage

Insuring Agreement
We will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured/underinsured motor vehicle because of bodily injury:
1. Sustained by a covered person; and
2. Caused by an accident.
 \* \* \* \* \* \*
"Covered person" as used in this Part means:
1. You or any family member.
2. Any other person occupying your covered auto.
 \* \* \* \* \* \*
"Uninsured motor vehicle" means a land motor vehicle or trailer of any type:
1. To which no bodily injury liability bond policy applies at the time of the accident.
 \* \* \* \* \* \*
Exclusions
A. We do not provide Uninsured/Underinsured Motorists Coverage for bodily injury sustained by any person:
1. While occupying or when struck by, any vehicle owned by you or any family member which is not insured for this coverage under this policy. This includes a trailer of any type used with that vehicle."

control of Louis and being operated by him."

*Id.* (emphasis added).

Gena and Anthony rely primarily on *Lumbermens Mutual Cas. Co. v. Harleysville Mut. Cas. Co.* (4th Cir.1966) 367 F.2d 250. In *Lumbermens* William Dalton owned a car with an effective insurance policy covering it. His son Ray owned a car without any insurance covering it. One morning William was unable to start his car. William was under agreement to pick up several fellow employees and take them to work at Burlington Mills. Ray also worked at Burlington Mills. William suggested to Ray that he take his car and pick up the other employees and take them to work. Ray agreed, and while driving the employees to work, was involved in an accident. Ray attempted to gain coverage under William's insurance policy by characterizing his car as a "temporary replacement automobile." The district court found that Ray was not covered by his father's policy. However, the Fourth Circuit Court of Appeals reversed finding that

"William was employing Ray's car to perform William's undertaking. Furthermore, the exclusive reason for the use of Ray's car on the day in question was the temporary unavailability of William's. For the emergency, William in effect borrowed, and Ray loaned, the latter's car. Who was to drive was immaterial to William. The reality of substitution is accented by the circumstance that the two cars were kept in the same location and owned by members of the same household and family. True, Ray may have had his own purposes for the trip aside from his father's, but this does not detract from the fact that William was also using the car to do what he would have done with his own."

*Id.* at 254. The court came to the conclusion that the temporary substitute provision "refers to the vehicle and not to the operator." *Id.*, and interpreted the temporary substitute clause to mean "temporarily used to the same extent as the automobile described in the policy." *Id.* at 255, quoting *Pennsylvania Thresherman & Farmers' Mutual Casualty Insurance Co.*

*v. Hartford Accident & Indemnity Co.* (4th Cir.1962) 310 F.2d 618, 622

The *Lumbermens* court addressed the *Tanner* decision, finding that Tanner was so divergent on its facts that it did not apply. In particular, the court noted that the fact that "the mission executed by the brother was not to fulfill any prior undertaking of the insured" *Id.* at 255, distinguished the two cases.

■ The existence of a prior undertaking on the part of the insured has been noted as a key factor in differentiating those cases in which a car is found to be a temporary substitute, from those cases in which the car is found not to be a temporary substitute.

In *Babineaux v. Lavergne* (1975), La. App. 321 So.2d 401, when an employer asked an employee to deliver paychecks in the employer's place because the employer's car had broken down, and the employee took on the task "strictly as a personal favor", *Id.* at 404, the employee's car could not be considered a temporary substitute when he was involved in a car accident while driving to a relative's house before delivering the checks.

In *Roberts v. Gonzalez* (D.C. Virgin Islands 1980) 495 F.Supp. 1310, Caribbean was a commercial airline scheduled to fly several passengers between San Juan and Saint Thomas. The plane Caribbean intended to use malfunctioned. Therefore, Caribbean transferred the passengers to a Conquest Airways flight. The Conquest plane, flown by Conquest employees, crashed. Families of the passengers sued Caribbean, and the district court was faced with the issue of whether the Conquest plane was a temporary substitute aircraft for purposes of Caribbean's insurance policy. The district court found that the plane was a temporary substitute, and in so doing differentiated its case from *Tanner* based on the fact that in *Tanner* "the errand was a spur of the moment accommodation; it was not to fulfill any prior undertaking of the insured's." *Id.* at 1321.

In *Fulton v. Woodford* (1972) 17 Ariz. App. 490, 498 P.2d 564, Sanner contracted

with Conway to provide trucks for the delivery of dirt. Conway hired Fulton to provide additional trucks, and Fulton in turn hired Patterson for even more trucks. Patterson was involved in an accident with Johansen. Johansen's widow sued, and the issue which eventually presented itself was whether Patterson's truck received coverage under Fulton's policy as a temporary substitute. In finding that the truck was a temporary substitute, the *Fulton* court distinguished *Tanner* because "the errand performed by the brother was no more than a brotherly accommodation and was not for the purpose of fulfilling a prior undertaking of his brother." *Id.* 498 P.2d at 570.

Following this theme in *Carnes v. Schram* (1989), 232 Neb. 282, 440 N.W.2d 451, the Nebraska Supreme Court found that the uninsured truck driven by Krajicek to pick up hogs for Schram was not a temporary substitute entitled to coverage under Schram's insurance policy. The court differentiated this case from *Lumbermens* and *Fulton* because "the legal and contractual compulsion regarding the use of the vehicles in [*Fulton* and *Lumbermens*] is replaced in the instant case by a simple act of courteous reciprocity." *Id.,* 440 N.W.2d at 456 (citations omitted).

The issue for us is whether Gena's actions could be better characterized as a favor to her mother, or as fulfilling a prior contractual or legal obligation which her mother owed. The answer is clear. While Dorothy may have felt some moral or maternal obligation to check on the welfare of her daughter, her obligation did not rise to the level of the contractual obligations present in *Lumbermens, Roberts,* or *Fulton.* Gena's checking on her sister did not fulfill a previous legal or contractual obligation which her mother owed, it constituted a favor to her mother, and nothing more.

Having said this, we apply the *Tanner* rule for "temporary substitute automobile." The *Tanner* court found that a substitute car meant "a car which was in the possession or under the control of the insured to the same extent and effect as the

disabled car of the insured would have been except for its disablement." *Tanner* at 500. Courts applying the *Tanner* rule have required that in order for a car to receive temporary substitute status, that car must be under the control of the insured, or the insured's designee, *See Tanner* at 500; *Carnes,* 440 N.W.2d at 456; *Babineaux* at 404.

To "designate" has been defined as "to indicate, select, appoint, nominate or set apart for a purpose or duty, as to designate an officer for a command." Black's Law Dictionary p 402 (5th edition, 1979). Designation in the present context necessarily implies the existence of a duty or obligation owed by designator. At the time of the accident, Dorothy had neither possession nor control over Gena's car. Dorothy requested that Gena check on her sister. No designation occurred. Therefore, the car was not entitled to temporary substitute status.

The trial court's ruling is affirmed.

HOFFMAN, J., concurs.

SULLIVAN, J., concurs in result.